UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HARRY P.,

                    Plaintiff,

          -against-                                        1:17-CV-1012 (LEK)

ANDREW SAUL,
Acting Commissioner of Social Security,

                    Defendant.
_____

## MEMORANDUM-DECISION AND ORDER

## I.        INTRODUCTION

On September 11, 2017, plaintiff Harry P. filed an action in this Court under the Social

Security Act. He seeks review of the determination of the Commissioner of Social Security that

he was not disabled from October 30, 2009 through the date of the Administrative Law Judge's

("ALJ") decision on September 13, 2016, and is therefore ineligible for disability insurance

benefits and supplemental security income. Dkt. No. 1 ("Complaint"); see also Dkt. Nos. 11–11-

1 "Record"), 16 ("Plaintiff's Brief"), 17 ("Defendant's Brief"). For the reasons that follow, the

Commissioner's determination of no disability is affirmed.

## II.       BACKGROUND

### A. The Disability Allegations and Plaintiff's Testimony

Plaintiff is a thirty-year-old man with a high school education. R. at 95. He worked a

variety of jobs when he was younger, but has not had substantial gainful employment since he

was assaulted at a bar in September 2007.[1] Pl.'s Br. at 1; R. at 16, 430. Plaintiff alleges an onset date of October 30, 2009, and initially filed for disability on January 31, 2013 due to "heart, hypertension," chest pains, anxiety attacks, and an 2007 assault resulting in "facial fractures." R. at 176. In response to a question on an appeals form that asked for updates to medical conditions, Plaintiff noted that "chest pains happen more frequently and [with] more intensity" and that "[s]tanding and kne[e]ling down increase chest pain." Id. at 450. He was also diagnosed with Chronic radiculopathy in 2015. Id. at 810.

Plaintiff's first hearing before ALJ Anne Sharrard took place on May 12, 2015. Id. at 73. The ALJ continued the hearing so Plaintiff could seek representation and gather more evidence. Id. at 81–88. Plaintiff was able to obtain representation for the continued hearing, which took place on February 18, 2016. Id. at 91.

Plaintiff stated that he is 5'11" and weighs 266 pounds. R at 103. The ALJ pointed out that when he filed for benefits in 2014, he listed his weight as 172 pounds. Id. Plaintiff explained that his weight gain is a result of his medications. Id. He recalled his doctor telling him that two of his medications in particular—gabapentin and Zyprexa—would cause weight gain. Id. at 103–104.

While Plaintiff states that he became disabled on October 30, 2009 and that some of his conditions are hereditary, Pl.'s Br. at 2, he explained at the hearing that "everything started after I got assaulted in 2007." Id. at 105–06.[2] Prior to the assault he worked as a security officer, as well as at three different Wendy's locations, a distribution center, and a temp agency. Id. at 107–

---

[1] While Plaintiff's Brief states that this assault took place in September 2008, the Court assumes that Plaintiff meant September 2007 as the Record includes many references—including Plaintiff's own testimony—to a September 2007 assault. R. at 30, 106, 672, 687.

[2] In his Brief, Plaintiff explains that he was out at a bar and "woke up in Albany Medical Hospital with major head injuries and loss of what happened." Pl.'s Br. at 1.

11.[3] He tried to go back to work after the assault, but "[s]till had a fractured jaw, still had headaches, and vertigo. And then everything just came on." Id. at 106. He started feeling chest pains towards the end of his shift and went to the emergency room. Id. at 112. The EKG was normal and Plaintiff tried to go back to work unloading trucks, but he "couldn't handle it anymore." Id.

Plaintiff lives with his partner of approximately seven years in a rented house. R. at 96, 102. They live with their three biological children, ages five, four, and four months, id. at 97, as well as Plaintiff's partner's eight-year-old son. Id. at 99. Plaintiff gives the baby his bottle and can change diapers. Id. at 97, 101. He will help the other kids with their homework at times, but he cannot play with them and chase them around the house like he used to. In response to the ALJ's question about how much he could lift, Plaintiff stated "I know I can lift the baby. He's less than ten pounds." Id. at 164. The ALJ questioned whether his five-month child really weighed only ten pounds and asked if the baby was born prematurely. Id. at 164–65. Plaintiff responded that the baby was not born prematurely but was small. Id. When asked why he could not lift more than ten pounds, Plaintiff stated that "[d]octors are saying things like . . . you shouldn't lift this until you find out what's going on." Id. at 166.

Plaintiff does not like going to grocery stores because he does not "like being in the store with a crowd of people." Id. at 145. His doctor at Clarendon County Mental Health has encouraged him to go outside more, and he does occasionally "go to [his] back porch" and "feed the birds." Id. When he is around people he will feel like someone is coming up behind him even if they are far away, and will start to feel "woozy" and have shooting chest pain, which can last for minutes to hours. Id. at 153–55. He takes Klonopin for his anxiety and panic attacks. Id.[4]

---

[3] In his Brief, Plaintiff also notes he is a "former machine operator." Pl.'s Br. at 1.

Plaintiff had been physically able to drive, but lost his driver's license in 2015 due to moving violations, a DUI, and driving on a suspended license. Id. at 115–16.

Plaintiff stated that he was not capable of working due to his depression, anxiety, problems being around other people, peripheral neuropathy, headaches, and side effects from medications including dizziness, tiredness, incoordination, and weight gain. [5] Id. at 118–19. He described the peripheral neuropathy as affecting his lower back all the way down to his feet. Id. at 119. Plaintiff was displeased with the neurosurgeon he saw in May 2015—seemingly because the doctor did not inform him that he had a bulge in his disc—and conveyed his displeasure to a nurse practitioner, Ramona Howard, whom he saw in June 2015. Id. The ALJ noted that Ms. Howard thought that "everything looked like it was healing." Id.

Plaintiff received two lumbar epidural steroidal injections before the hearing, and had a third scheduled for shortly after. Id. at 122. He received the two epidurals about a month apart; the first provided four days of back pain relief and the second provided two days of relief. Id. at 122–23. He was able to walk normally while the epidurals were working. Id. at 123. He also has a back brace, which he wears twice a day for three hours at a time, but it is uncomfortable and provides limited relief. Id. at 124–25. He also has a back massager with a heating pad inside, which provides occasional relief. Id. at 127. He also does daily exercises and stretches for his knees and back that were recommended by pain management. Id. He began visiting pain management in December 2015, and had been to three appointments by the time of the hearing. Id. at 129–30. He was attending physical therapy in early 2015, but stopped after four appointments because of transportation difficulties. Id. 131–132.

---

[5] In his brief, Plaintiff adds that he has panic attacks lasting more than four hours and that standing more than five minutes strains his back and knees. Pl.'s Br. at 1–2.

The ALJ asked Plaintiff about his visit to a consultative examiner, Dr. Cory, who noted that Plaintiff had a cane but did not need it. Id. at 132. Plaintiff explained that he has osteoarthritis in both his knees and that they "give out." Id. at 132, 134. The ALJ also asked Plaintiff about statements from doctors expressing skepticism about Plaintiff's heart problems. In particular, the ALJ noted that, in 2012, a Dr. Schwartman had written that "he didn't know how [Plaintiff] got the idea of having . . . cardiac disease," and that, in 2014, a Dr. Starvou had written "need to be more frank with this patient about the possibility of his chest pain not being cardiac." R. at 136, 141. Plaintiff responded that he does have heart disease and that Dr. Starvou just doubled his dosage of Propranolol, a medicine intended to slow his heart beat. Id. The ALJ noted that Dr. Starvou thought stress and panic were part of the issue. Id. at 142.

Plaintiff stated that he quit smoking in mid-2015. R. at 139. It helped his breathing and gave him a "clearer mind" but other than that he still has "the same exact symptoms." Id. He rarely drinks. Id. at 139–40. He takes Zyprexa to help him sleep. Id. at 146–47. He usually goes to bed around 10:00 PM, but one or more times a week he is unable to fall asleep until around 3:00 AM. Id. at 143. Plaintiff gets daily headaches, which last for hours and primarily cause pain in his temples and the back of his head. Id. at 148–50.

**B. The ALJ Decision**

On September 13, 2016, the ALJ issued a decision finding Plaintiff was not disabled from October 30, 2009 through the date of the decision. Id. at 40–41. In making this determination, the ALJ analyzed Plaintiff's testimony, the opinions of medical experts, and the underlying medical record.

First, the ALJ found that Plaintiff met the SSA's insured status requirements and had not engaged in substantial gainful activity since October 30, 2009, the alleged onset date. Id. at 16. Next, the ALJ found that Plaintiff had the following severe impairments: obesity, essential

hypertension, post-concussive headaches, radiculopathy at L5-S1 to the left lower extremity, generalized anxiety disorder, panic disorder with agoraphobia, and depressive disorder. Id. at 17–18. The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Id. at 18.

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> perform light work . . . defined as lifting/carrying twenty pounds occasionally and ten pounds frequently. In an eight-hour day, he can sit six hours, stand one hour, and walk one hour. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps, climb stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally push/pull and operate foot controls bilaterally with his lower extremities. He must avoid even moderate exposure to hazards. He is limited to simple and routine tasks in a low stress job, which is defined as having only occasional changes in the work setting and only occasional decision making required. He cannot perform production-pace work, such as assembly line work, but he can perform goal-oriented work that can be completed by the end of the work shift. He can have occasional, brief and superficial interaction with supervisors and co-workers and no face-to-face interaction with the general public.

Id. at 20.

### 1. ALJ's analysis of Plaintiff's testimony

The ALJ found "that the claimant's medically determinable impairments could be reasonably be expected to cause some of the expected symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence." Id. at 33.

In making this determination, the ALJ first analyzed Plaintiff's testimony. Id. at 21. The ALJ found that some of Plaintiff's claims about his back are unsupported. Id. at 22. For instance,

the ALJ noted that while Plaintiff listed peripheral neuropathy as one of the reasons he is unable to work, his electromyography "only noted *possible* sensory polyneuropathic process and peripheral neuropathy was never diagnosed." <u>Id.</u> at 21, 34 (emphasis in original). The ALJ also noted that while Plaintiff testified that Dr. Bigelow informed him he had a bulging disc, Dr. Bigelow had noted only "mild foraminal stenosis at L4-5 with no mention of a bulging disc in treatment notes." <u>Id.</u> at 22 (citing <u>id.</u> at 1542). The ALJ also noted that the record lacked any documentation of a treating physician informing Plaintiff not to lift more than ten pounds, nor was Plaintiff able to point to any evidence that he was unable to lift ten pounds. <u>Id.</u> The ALJ also expressed skepticism that Plaintiff's five-month-old child, whom he is able to lift, weighed less than ten pounds as Plaintiff stated. <u>Id.</u> The ALJ also did not find that Plaintiff needed a cane, stating that x-rays of his knee were "unremarkable with only mild findings." Further, Dr. Khoury had noted the cane was not medically necessary. <u>Id.</u> (citing <u>id.</u> at 1456).

The ALJ found that the limited treatment Plaintiff has sought for his back issues and headaches "support a finding that he is not as disabled as he alleges." <u>Id.</u> at 34. The ALJ further noted that his medical exams indicated more minor heart and back issues than he alleges. <u>Id.</u> at 34; <u>see e.g.</u>, R. at 621 (primary care note stating "I do not know how [Plaintiff] got the idea there was potentially cardiac disease.")

The ALJ noted that while Plaintiff stated his partner takes care of nearly all the childcare, Plaintiff told Dr. Smith in 2013 that he took care of the children. <u>Id.</u> at 23, 38 (citing <u>id.</u> at 821). Further, a 2015 psychiatric medical assessment notes that Plaintiff "spends day taking care of children and other household chores." <u>Id.</u> (citing <u>id.</u> at 733).

The ALJ explained that she limited Plaintiff's "exposure to hazards" and included "postural limitations" in Plaintiff's RFC to account for the side effects of Plaintiff's medications.

R. at 21. She also limited him to simple and routine tasks in a low stress job with no production-pace work "which would account for some fatigue from medications." The ALJ also factored Plaintiff's headaches into account in determining these limitations, and noted that the evidence backed Plaintiff's claim that he was told not to take NSAIDs (because of gastroesophageal reflux disease) and took Tylenol instead. Id. at 23. But the ALJ noted that "the lack of objective evidence and other forms of treatment" for the headaches did not support more stringent limitations. Id.

The ALJ gave "some weight" to Plaintiff's allegations of mental impairments. R. at 35. The ALJ limited Plaintiff's interactions with others based on his agoraphobia and limited him to simple tasks based on his anxiety, depression, and panic disorder. Id. However, the ALJ also noted that despite the alleged onset date of October 30, 2009, Plaintiff did not seek mental health treatment until 2013. Id. And since 2013, Plaintiff had not consistently attended therapy or counseling and was treated mostly with medication. Id. Further, the ALJ noted that the "claimant's medications have been relatively effective in controlling the claimant's symptoms." Id.

### 2. ALJ's analysis of medical and opinion evidence

The ALJ gave great weight to the opinions of state agency specialists Dr. Holland and Dr. Mani that Plaintiff had "no severe physical limitations." R. at 35–36. The ALJ noted that this was "consistent with the physical exams, treatment notes, and diagnostic testing" they had reviewed. Id. However, the ALJ also noted that the medical evidence the state agency specialists reviewed was over two years old and that the evidence at the hearing warranted "more restrictions and supports some severe physical impairments, especially in light of the low back pain with radiculopathy at L5-S1 that began in early 2014." Id. at 36.

The ALJ gave little weight to the opinion of Suzanne Johnson, a treating nurse practitioner. Ms. Johnson signed a medical release form on May 18, 2015 in which she diagnosed Plaintiff with low back pain and anxiety. Id. at 36 (citing id. at 1314) On that form, she also checked boxes indicating that Plaintiff was unable to work and that the disability was "not permanent but was expected to last more than 90 days." Id. The ALJ gave this statement little weight because "a statement from a medical source that a person is disabled or unable to work is not binding" and is a decision reserved to the Commissioner. Id. at 37. But the ALJ did note that Ms. Johnson did not believe Plaintiff's disability was permanent. Id.

The ALJ gave great weight to the opinion of Dr. Khoury, a consultative examiner and neurosurgeon, that Plaintiff "can only occasionally operate foot controls bilaterally and that he needed to avoid hazards based on his L5-S1 radiculopathy and use of medications." Id. at 37. The ALJ also adopted Dr. Khoury's opinion that Plaintiff's cane was not medically necessary. Id. However, the ALJ gave little weight to Dr. Khoury's opinion that Plaintiff could only lift or carry ten pounds." Id. The ALJ explained:

> Dr. Khoury gives no reason for this and imaging of the claimant's lumbar spine showed only mild findings. The claimant even said he could lift more than ten pounds in the function report . . . At the hearing he said that his limitations in lifting are due to deconditioning, in essence, which is not a severe impairment and could improve if he attended physical therapy for more than a few sessions. At any rate [Plaintiff's RFC is] sedentary, so the failure to adopt Dr. Khoury's lifting restrictions does not affect the outcome. Dr. Khoury himself notes significant inconsistency on exam with respect to lower extremity weakness and no objective evidence of true weakness in the legs of legitimate cause. He relied heavily on the claimant's subjective reports for his opinion, which renders his opinion less persuasive.

Id. The ALJ also noted that he factored Dr. Khoury's expertise and his opportunity to examine Plaintiff and listen to his subjective complaints into his analysis. Id. at 37.

Plaintiff was given a Global Assessment of Functioning ("GAF") in 2013, 2014, and 2015. R. at 37–38. The ALJ noted that a GAF rating is opinion evidence, but stated that "[u]nless the clinician clearly explains the reasons behind the GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." Id. at 38. Thus, although the GAF score indicated moderate limitations consistent with Plaintiff's RFC, the ALJ accorded it little weight because the clinicians did not provide a specific explanation for the GAF score. Id.

The ALJ gave "some weight" to the opinions of state agency specialists Dr. Goots and Dr. Lyman, who indicated that Plaintiff "had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." R. at 36. Dr. Goots also stated that Plaintiff could "concentrate well enough to complete routine tasks with ordinary supervision . . . could complete a normal workweek with an occasional interruption due to his mental condition . . . [and] would function best in a work setting with limited contact with the general public and minimal interaction with coworkers and supervisors." Id. The ALJ noted Dr. Goots and Dr. Lyman were experts and that their findings were consistent with the medical records. But he discounted their opinions because they were based on medical records from two years prior to the hearing and did not consider the more recent evidence showing that Plaintiff had more significant impairments, "including moderate limitations in maintaining concentration, persistence, or pace and . . . difficulty coping with stress," which led the ALJ to "limit[] him to simple and routine tasks in a low stress job." Id.

In sum, the ALJ found that the "record reveals the claimant has severe physical and mental impairments that would reasonably limit his ability to perform basic work activities." R.

at 39. But the ALJ stated that Plaintiff's RFC was justified, noting that "the lack of persistent complaints, [lack of] severe findings or notations by his examiners, [and] the claimant's noncompliance with treatment and failure to seek different kinds of treatment does not support the need for a further restrictive residual functional capacity." Id.

Next, the ALJ determined that Plaintiff had no past relevant work. Id. at 39. Because Plaintiff could not perform the full range of "light work," the ALJ asked a vocational expert ("VE") whether an individual with Plaintiff's age, education, work experience, and RFC could perform any jobs that exist in the national economy. Id. at 40. The VE stated the Plaintiff would be able to perform "sedentary, unskilled occupations" such as a telephone quotation clerk, charge account clerk, and order clerk in the food and beverage industry. Id. Based on this testimony, the ALJ made a finding of "not disabled." Id.

The Appeals Council denied Plaintiff's request for review. Id. at 3.

## III.     LEGAL STANDARD

### A.  Standard of Review

When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, a court should not

uphold the ALJ's decision—even when there is substantial evidence to support it—if it is based on legal error. Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).

**B.  Standard for Benefits**

According to Social Security Administration ("SSA") regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984). To determine a claimant's eligibility for disability benefits, there is a five-step evaluation process. 20 C.F.R. § 404.1520(a)(1). If the ALJ is able to determine that the claimant is disabled or not disabled at a step, the evaluation ends. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. Id.

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." § 404.1520(a)(4)(i). If so, the claimant is not disabled under SSA regulations. Id. At step two, the ALJ must determine whether the claimant has an impairment, or combination of impairments, that is "severe," i.e., that "significantly limits" the claimant's "physical or mental ability to do basic work activities." §§ 404.1520(a)(4)(ii), 416.920(c). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the ALJ asks whether the claimant's medically determinable physical or mental impairment(s) are as severe as an impairment listed in Appendix 1 of Subpart P of § 404. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If so, the claimant is disabled. Id. If not, the ALJ moves on to step four and reviews the claimant's residual functioning capacity ("RFC") and past work. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if

12

she can perform past work. Id. If the claimant cannot perform her past work, the ALJ decides at step five whether adjustments can be made to allow the claimant to work in a different capacity. § 404.1520(a)(4)(v). If the claimant "cannot make an adjustment to other work," then the claimant is disabled. Id. In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

## IV.   DISCUSSION

Plaintiff's pro se appeal must be construed liberally to raise the strongest arguments that it suggests. Adelman v. Berryhill, 742 F. App'x 566, 571 (2d Cir. 2018). Reading Plaintiff's Brief generously, he argues that the ALJ erred in three ways: (1) the ALJ failed to properly weigh the medical and opinion evidence in determining Plaintiff's RFC; (2) the ALJ improperly discounted Plaintiff's subjective complaints; and (3) the ALJ failed to properly inform the VE of Plaintiff's RFC and failed to incorporate the VE's testimony. Pl.'s Br. at 1–3.

### A. ALJ's Consideration of the Medical and Opinion Evidence

Plaintiff argues that the ALJ's determination of his RFC is not supported by substantial evidence because the ALJ insufficiently considered the medical and opinion evidence of Plaintiff's mental and physical limitations. RFC is "what [the] individual can still do despite his or her limitations." Gishey v. Colvin, No. 13-CV-1036, Dkt. No. 19 at 8–9 (N.D.N.Y. Feb. 23, 2015), report-recommendation adopted by 2015 WL 1505674, at *7 (N.D.N.Y. Mar. 31, 2015) (Kahn, J.) (internal quotations omitted) "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.] A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." Id. "In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a

plaintiff's subjective symptoms, including pain and descriptions of other limitations." Id. (citing 20 C.F.R. §§ 404.1545, 416.945). "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). However, "[w]here an ALJ's analysis . . . affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence . . . remand is not necessary merely because an explicit function-by-function analysis was not performed." Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013). "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id.

The Court first analyzes whether there is substantial opinion and medical evidence supporting Plaintiff's RFC as it pertains to mental limitations, and then considers physical limitations.[6]

### 1. Mental limitations

The ALJ properly gave Plaintiff's GAF score little weight, noting that there was no explanation of the GAF scores. "The Social Security Administration has explained that '[u]nless [a] clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.'" Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019) (quoting U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014)). In any event,

---

[6] The Court considers Plaintiff's subjective complaints in the following section.

Plaintiff's GAF scores were consistent with the moderate limitations the ALJ ultimately found. R. at 38.

The ALJ properly gave some weight to Dr. Goots' and Dr. Lyman's opinions that Plaintiff had only mild limitations in daily living; maintaining concentration, persistence, or pace; and concentrating well enough to complete routine tasks with ordinary supervision. The ALJ properly discounted their opinions to the extent that they suggested Plaintiff had less than moderate limitations because they were inconsistent with more recent evidence. R. at 36; see also Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record.").

However, the medical evidence does not support Plaintiff's claim that he has limitations more severe than those listed in his RFC—and it is clear the ALJ took these limitations into account. An August 21, 2013 exam, for instance, noted that Plaintiff had anxiety, depression, wakes early, and was easily irritated and fearful. Id. at 730. The same exam also noted, however, that Plaintiff was "able to articulate well with normal speech/language," had the "ability to perform basic computations and apply abstract reasoning," and "demonstrate[d] appropriate judgment and insight." Id. at 731. Several exam reports note similar findings. See id. at 667, 669–70, 1060–61, 1250. An October 2015 assessment noted a history of depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia, and added a diagnosis of bipolar. R. at 1533–34. But like the previous assessment, it also noted that Plaintiff's memory, attention, and concentration were "intact" and that his judgment and insight were "good." Id. at 1533. The ALJ also noted that medications have been "relatively effective in controlling claimant's symptoms." R. at 35; see id. at 1025 (assessment noting that Celexa put Plaintiff in "a

little better mood"), 957 (assessment noting that Plaintiff had stopped Celexa and Trazodone gives him nightmares, but that Klonopin "works for him").[7]

The ALJ took note of these limitations, stating that she "limited him to simple and routine tasks in a low stress job based on his ongoing symptoms of anxiety, depression." Id. at 35. Further, she "limited him to occasional, brief and superficial interaction with supervisors and co-workers and no face-to-face interaction with the general public" based on his panic disorder and agoraphobia. Id.

### 2. Physical limitations

In considering Plaintiff's physical limitations, the ALJ properly gave great weight to Dr. Holland's and Dr. Mani's consultative opinion that Plaintiff had minimal limitations because Dr. Holland and Dr. Mani were expert medical professionals who had an opportunity to review the record, and their opinions were generally consistent with the medical record. Id. at 36; see Frye ex rel. A.O, 485 F. App'x at 487. Dr. Holland noted that "[c]hest pain has been a recurrent problem and has been diagnosed variously as anxiety, chest wall pain (contusion), and on one occasion highly suspicious for pericarditis." R. at 180. Dr. Holland also noted there was "no evidence of heart disease." Id. The ALJ appropriately noted, however, that these opinions did not consider the most recent evidence of radiculopathy and accordingly found that Plaintiff had more severe physical limitations in that regard. Id. at 36.

The ALJ properly gave little weight to Nurse Practitioner Johnson's treating opinion that Plaintiff was unable to work and that the disability was "not permanent but was expected to last more than 90 days." R. at 36, 1314. SSA regulations state that the ALJ "will not give any special

---

[7] It should be noted this same note also stated "[Plaintiff] reports he is not doing well on the medicine." Id. This seems to be referring to Trazodone, which the note states Plaintiff should stop taking. Id.

significance to the source of an opinion on issues reserved to the Commissioner" such as whether a claimant is disabled. 20 C.F.R. § 404.1527. The fact that Ms. Johnson was a treating source does not change this analysis. S.S.R. 96-5p, 1996 WL 362206, 61 F.R. 34471-01 (S.S.A. July 2, 1996) ("[E]ven when offered by a treating source, [opinions on issues reserved to the Commissioner] can never be entitled to controlling weight or given special significance."). Further, Ms. Johnson did not complete the sections of the form that sought her opinion on Plaintiff's ability to stand, walk, climb, and lift objects, so there was no opinion evidence from her for the ALJ to consider on those issues. R. at 1314.

The ALJ also properly gave little weight to Dr. Khoury's consultative opinion that Plaintiff "could only lift/carry up to ten pounds occasionally and never climb, balance, stoop, kneel, crouch or crawl." Plaintiff himself stated that he could lift 10–15 pounds in his function report. R. at 37, 445. And Defendant points to Dr. Khoury's own note that states "it is unclear why [Plaintiff] would have lower extremity weakness. He has significant inconsistency on exam with respect to lower extremity weakness." Def.'s Br. at 8–9; R. at 1456. With the medical evidence inconclusive, the ALJ noted that Dr. Khoury's opinion appears to be based primarily on Plaintiff's subjective statements. Id. at 37. Thus, the ALJ was justified in finding Dr. Khoury's opinion on this issue "less persuasive." Id.; see Roma v. Astrue, 468 F. App'x 16, 19 (2d Cir. 2012) (holding that an ALJ did not err in according a doctor's opinion little weight in part because "the supportability of [the doctor's] opinion was doubtful as it was based largely upon [the plaintiff's] subjective responses"). And in any event, the VE identified only sedentary jobs, rendering this irrelevant.[8]

_____

[8] Because of the significant inconsistencies described above, and because the issue of how much Plaintiff can lift ultimately appears unrelated to the question of whether he can perform the sedentary jobs identified by the VE, the Court finds substantial evidence supports

There is also substantial evidence in the medical record supporting Plaintiff's RFC. With respect to Plaintiff's heart, Dr. Nathan Littauer noted in 2012 that Plaintiff's exam was normal except for "[m]ild tenderness on palpation of the mid right lateral ribs." R. at 616. Dr. Littauer assessed Plaintiff as having only a chest wall contusion. Id. at 617. A diagnostic imaging report dated February 19, 2013 noted that Plaintiff's "heart size and mediastinum are normal." Id. at 637. On June 4, 2013, Nurse Practitioner Johnson performed a cardiovascular exam with normal results, and noted "regular rate and rhythm without murmurs, rubs or gallops." Id. at 709. Plaintiff also had an echocardiogram that day, which Ms. Johnson noted was "completely unremarkable." Id.

The medical record is similarly devoid of evidence that Plaintiff's RFC fails to account for the severity of his back issues. Notes from a physical therapy session in March 2015 state that Plaintiff had normal sitting and standing balance ability, and no balance deficits. R. at 798. These notes do state that Plaintiff reported chronic back pain, id. at 796, and that he rated his pain at a 9–10 out of 10 while standing or walking for more than five minutes, id. at 820. The same notes, however, document only minimal loss of lumbar extension, id. at 821, and state that Plaintiff has failed to progress due to "sporadic attendance and lack of compliance," id. at 809. On March 3, 2015, Plaintiff was diagnosed with chronic radiculopathy and it was noted that Plaintiff had, among other things, "chronic left lower lumbar nerve root irritation." R. at 810. However, December 2015 and January 2016 exams revealed only that "[range] of motion for the lumbar spine is mildly restricted." Id. at 1496, 1502.

---

the ALJ's decision without relying on the ALJ's speculation about the weight of Plaintiff's five-month-old child.

Plaintiff's purported knee problems also do not undermine the substantial evidence supporting Plaintiff's RFC. A March 6, 2014 exam of Plaintiff's left knee was "[r]adiographically normal." Id. at 1217. A December 2, 2015 exam of both knees revealed "minimal patellofemoral degenerative change with otherwise negative bilateral knee study." Id. at 1504. And, as mentioned above, Dr. Khoury wrote that Plaintiff "[u]tilizes cane for unclear purpose" and that there is "no objective evidence of true weakness in the legs of legitimate cause." Id. at 1456.

"Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, [the ALJ is] entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013). Here, there is sufficient evidence backing the ALJ's determination that Plaintiff's mental and physical impairments are not more severe than set forth in Plaintiff's RFC.

### B. ALJ's consideration of Plaintiff's subjective complaints

Plaintiff argues that the ALJ improperly discounted his testimony about the nature and severity of his limitations. Pl.'s Br. at 3. As discussed, Plaintiff testified that that he was not capable of working due to his depression, anxiety (especially when around lots of people), being around other people, peripheral neuropathy, headaches, and side effects from medications. R. at 118–19. The ALJ found that "that the claimant's medically determinable impairments could reasonably be expected to cause some of the expected symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence." Id. at 33.

When determining Plaintiff's RFC, the ALJ was required to consider "plaintiff's subjective symptoms, including pain and descriptions of other limitations." Gishey, No. 13-CV-1036, Dkt. No. 19 at 8–9. However, "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant . . . If there is substantial evidence in the record to support the Commissioner's findings, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Ocasio v. Astrue, 32 F. Supp. 3d 289, 301 (N.D.N.Y. 2012) (internal quotations omitted) (alterations in original). Here, as discussed above, there is substantial evidence in the record supporting Plaintiff's RFC. And some of Plaintiff's statements contrast with the documentation in the record. For instance, the record includes statements from Plaintiff in 2013 and 2015 that he spent his days taking care of the children and performing most of the housework. R. at 733, 821. This contrasts with Plaintiff's testimony in front of the ALJ that he was unable to perform most chores or take care of his children beyond changing the baby's diaper and giving the baby a bottle. Id. at 97, 100–02. Thus, the ALJ properly discounted Plaintiff's subjective statements. See Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) (holding that the ALJ properly found claimant's testimony about his limitations was not fully credible in part because the evidence that claimant cared for his one-year-old child and performed housework undermined his subjective complaints).

### C. Testimony of the Vocational Expert

Plaintiff appears to argue either that the ALJ asked the VE improper questions or that the ALJ failed to incorporate the VE's testimony into her decision. Pl.'s Br. at 2. While the Court considers both of these arguments in light of Plaintiff's pro se status, neither are persuasive.

First, with the respect to the ALJ's questions for the VE, the ALJ described a hypothetical individual with limitations consistent with Plaintiff's RFC. The ALJ instructed the

VE to consider an individual of the same age, education, and work experience as Plaintiff who was, among other things, limited to "simple and routine tasks in a low-stress job" and "occasional but also brief and superficial interaction with supervisors and coworkers." R. at 169–71. Because Plaintiff's RFC was supported by substantial evidence, the ALJ's reliance on this testimony was similarly supported. <u>See</u> <u>Calabrese v. Astrue</u>, 358 F. App'x 274, 276 (2d Cir. 2009) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence . . . and accurately reflect the limitations and capabilities of the claimant involved.").

Second, contrary to Plaintiff's argument that ALJ failed to incorporate the VE's testimony into her decision, the ALJ relied on the VE's testimony in finding that Plaintiff could perform occupations such as a telephone quotation clerk or charge account clerk. R. at 40. It appears that Plaintiff attempts to rely on the VE's statement that there would be no jobs available to an individual who was off task for than twenty percent of the day. Pl.'s Br. at 2; R. at 172. But the VE stated this in response to a hypothetical question from Plaintiff's counsel. <u>Id.</u> The ALJ did not rely on the answer to that question because she did not find that Plaintiff would be off task more than twenty percent of the day. <u>See</u> R. at 40. Thus, the ALJ did not err in her reliance on the VE's testimony.

\*     \*     \*

The Court does not doubt that Plaintiff lives with pain. Nor does it doubt that the assault has left Plaintiff struggling with his mental health. However, "[i]f supported by substantial evidence, the Commissioner's finding must be sustained even where substantial evidence may support the plaintiff's position." <u>Ryan v. Astrue</u>, 650 F. Supp. 2d 207, 211 (N.D.N.Y. 2009). As

discussed, the ALJ's decision is supported by substantial evidence. Thus, the Court must affirm it.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      September 26, 2019
            Albany, New York

Lawrence E. Kahn
U.S. District Judge